**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SUSAN ROZEK


                         Plaintiff,

                                                        **MEMORANDUM OF**
         -against-                                      **DECISION AND ORDER**
                                                        10-CV-3147 (ADS)(WDW)
NEW YORK BLOOD CENTER and NEW
YORK BLOOD CENTER in its capacity as
Plan Administrator of New York Blood Center,
and FIRST UNUM LIFE INSURANCE
COMPANY


                         Defendants.
--------------------------------------------------------X
<u>**APPEARANCES:**</u>

**Law Offices of Wayne J. Schaefer, LLC**
*Attorneys for the Plaintiff*
199 East Main Street
Suite 4
Smithtown, NY 11787
         By:   Wayne J. Schaefer, Esq., Of Counsel

**Begos Horgan & Brown, LLP**
*Attorneys for the Defendants*
2425 Post Road
Southport, CT 06890
         By:   Patrick W. Begos, Esq.
               Daniel Green, Esq., Of Counsel

**SPATT, District Judge**.

         The Plaintiff Susan Rozek ( "the Plaintiff") brings this action under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., against the Defendants

New York Blood Center ("NYBC"), NYBC in its capacity as Plan Administrator of NYBC, and

First Unum Life Insurance Company ("First Unum," and collectively, "the Defendants").  She

alleges that she was wrongfully denied long-term disability benefits by First Unum under the

terms of the NYBC Plan ("the Plan"), which was an employee welfare benefits plan funded by

the Plaintiff's former employer, NYBC. The Plaintiff also seeks a claim to recover Retirement Income Protection ("RIP") benefits allegedly due under the terms of the Plan.

Presently before the Court are the parties motions for summary judgment, as well as the Defendants' *in limine* motion to preclude the introduction at trial of any evidence other than the contents of the administrative record. For the reasons set forth below, the Court grants summary judgment in favor of the Defendants with respect to all of the Plaintiff's claims. Further, in light of the Court's summary judgment decision, the Court deems the Defendants' *in limine* motion to be moot.

## I. BACKGROUND

On October 2, 1989, the Plaintiff began working for the NYBC in the position of a Blood Donor Specialist, also known as a phlebotomist. During her tenure at NYBC, she was a participant in the Plan. During this period, the Plan was insured by First Unum, and First Unum administered all claims for benefits under the Plan.

## A. The Plan

Under the terms of the Plan, a plan participant is initially considered disabled–and thus, eligible for long-term disability benefits–when (1) "[she] [is] limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury"; (2) "[she] [has] a 20% or more loss in [her] indexed monthly earning dues to the same sickness or injury"; and (3) "during the elimination period, [she] [is] unable to perform any of the material and substantial duties of [her] regular occupation." (Administrative Record ("AR") 119.) The elimination period is defined as "a period of continuous disability which must be satisfied before [a plan participant] [is] eligible to receive benefits from [First] Unum." (AR 139.) It is set at 180 days. (AR 119.)

"After 24 months of payment," a plan participant is considered disabled–and thus, remains eligible for long-term disability benefits–when "due to the same sickness or injury, [she] [is] unable to perform the duties of any gainful occupation for which [she] [is] reasonably fitted by education, training or experience." (AR 119.) The Plan defines gainful occupation as "an occupation that is or can be expected to provide [a plan participant] with an income at least equal to 60% of [her] indexed monthly earnings within 12 months of [her] return to work." (AR 139.)

Under the Plan, First Unum will cease sending a plan participant long-term disability benefits on the earlier of the following:

- During the first 24 months of payments, when [the plan participant] [is] able to work in [her] regular occupation on a part-time basis but [] choose[s] not to;
- After 24 months of payments, when [the plan participant] [is] able to work in any gainful occupation on a part-time basis but [] choose[s] not to[;]
- The end of the maximum period of payment;
- The date [a plan participant] [is] no longer disabled under the terms of the plan[;]
- The date [the plan participant] fail[s] to submit proof of continuing disability;
- The date [the plan participant's] disability earnings exceed[s] the amount allowable under the plan
- The date [the plan participant] dies.

(AR 124.)

The Plan also includes a provision for RIP benefits. Under this provision, First Unum agrees to "pay [a plan participant's] Employer an extra benefit to be deposited into the plan on [her] behalf" if the plan participant was (1) "receiving disability payments" and (2) "had been a participant in the pension plan for at least 3 months prior to [her] disability[.]" (AR 129.)

The Plan grants First Unum complete discretion and authority to interpret the terms of the Plan and to determine a participant's eligibility for benefits. In this regard, the Plan states that "[w]hen making a benefit determination under the policy, [First] Unum has discretionary

authority to determine [a plan participant's] eligibility for benefits and to interpret the terms and

provisions of the policy." (AR 115.) According to the Plan,

> [i]n exercising its discretionary powers under the Plan, the Plan
> Administrator and any designee (which shall include [First] Unum
> as a claims fiduciary) will have the broadest discretion permissible
> under ERISA and any other applicable laws, and its decisions will
> constitute final review of [a plan participant's] claim by the Plan.
> Benefits under this Plan will be paid only  if the Plan
> Administrator or its designee (including [First] Unum), decides in
> its discretion that the applicant is entitled to them.

(AR 138.)

As part of her motion for summary judgment, the Plaintiff included excerpts from "The

Benefits Center Claims Manual" ("the Claims Manual"), which First Unum allegedly uses when

making long-term disability benefits determinations. (Pl. Br., pg. 10–11; Schaefer Decl., Exs. A

and B.) According to the Claims Manual,

> Benefits Specialists should give significant weight to an award of
> Social Security Disability benefits as supporting a finding of
> disability unless there is *compelling* evidence that the Social
> Security Award was:
>     1. based on error of law or abuse of discretion;
>     2. inconsistent with applicable medical evidence; or
>     3. inconsistent with the definition of disability contained in
> the applicable contract.

(Schaeffer Decl., Exh. A.) "Inconsistent applicable medical evidence" is defined as "evidence

of illness/injury, limitations, or restrictions that differs to such a degree from that considered by

the [Social Security Administration ("the SSA")], that there likely would be no finding of

disability if the SSA did consider it." (Schaeffer Decl., Exh. B.) For example, "an independent

evaluation after the [social security disability insurance] award was made . . . clearly

establish[ing] that the claimant has no current [restrictions and limitations] that would prevent

the individual from working" would constitute inconsistent applicable medical evidence. (Schaeffer Decl., Exh. B.)

## B.  The Plaintiff's Medical History

On December 21, 2005, the Plaintiff, then 52 years old, sustained injuries when she fell at a mobile blood drive while working.  (AR 54.)  This was the last day she worked before her alleged disability.  (AR 54.)  The Plaintiff's first symptoms included back pain, hip pain, right ankle pain, knee pain and leg pain.  (AR 54.)

Prior to her fall on December 21, 2005, on November 23, 2005, the Plaintiff visited her orthopedist, Dr. Richard A. Rogaschefsky, M.D. ("Dr. Rogaschefsky").  (AR 488.)  At this appointment, the Plaintiff complained of right hip pain.  (AR 488.)  Dr. Rogaschefsky diagnosed that the Plaintiff had "[r]ight hip greater trochanter bursitis" and directed the Plaintiff to "begin physical therapy, stretching exercises for the IT band, [and] anti-inflammatories as needed." (AR 488.)   He also directed the Plaintiff to follow-up with him in four weeks.  (AR 488.)

On December 22, 2005, the day after her fall, the Plaintiff saw Dr. Rogaschefsky and complained of "back/flank pain," as well as "right knee and ankle pain."  (AR 489.)  Dr. Rogaschefsky diagnosed the Plaintiff with "[l]umbosacral spine strain, rib contusion, right knee contusion [and] right ankle sprain."  (AR 489.)

On January 23, 2006, the Plaintiff received an MRI of the lumbosacral spine.  (AR 57.) The MRI showed a "small central disc herniation [at the L4-5 level] effac[ing] the ventral aspect of the thecal sac."  (AR 57.)  In addition, the MRI indicated that there was "mild anterior listhesis of L5 on S1 with pseudo disc bulging and mild bilateral neural foraminal stenosis." (AR 58.)  The Plaintiff also underwent an MRI of her right hip on February 14, 2006.  (AR 59.)

The MRI revealed "[p]ossible minute right hip effusion." (AR 59.) However, there was "[n]o evidence or labral tear or other focal pathology." (AR 59.)

From January 25, 2006 until March 29, 2006, the Plaintiff attended physical therapy sessions at Advanced S.P.O.R.T.S. (AR 945.) She received 21 physical therapy treatments in total. (AR 945.) In a progress report dated March 29, 2006, the Plaintiff's physical therapist noted that the Plaintiff's response to treatment had been "fair," but that the Plaintiff "continue[d] to complain of low back pain" and had difficulty with activities of daily living. (AR 945.) The physical therapist concluded that the Plaintiff "ha[d] made little progress [with] physical therapy." (AR 945.)

On April 19, 2006, the Plaintiff was evaluated by Dr. Salvatore Palumbo, M.D. ("Dr. Palumbo"), who was a neurosurgeon. (AR 367.) In a letter also dated April 19, 2006, Dr. Palumbo informed Dr. Rogachefsky that the Plaintiff was "in no apparent distress" during the evaluation, but "appear[ed] to have discomfort with both hyperextension as well as flexion of the lumbar region." (AR 367.) The Plaintiff also had "pain with palpation over the right paracentral and right sacroiliac region," but her hip "d[id] not appear to be significantly uncomfortable with palpation or rotation." (AR 367.) Dr. Palumbo noted that an MRI of the Plaintiff's lumbar spine revealed "mild to moderate disc degeneration at L4/L5," as well as "some minimal loss of disc height at this level." (AR 367.) The "other disc heights appear[ed] to be well preserved." (AR 367.) In addition, "[t]here [wa]s some mild lateral recess stenosis noted at L4/L5 secondary to disc bulging." (AR 367.)

At the Plaintiff's April 19, 2006 office visit, Dr. Palumbo assessed that the Plaintiff had "persistent right buttock and right hip and groin pain," which "appear[ed] to be stemming mainly from pathology of the right hip joint." (AR 367.) He stated that the Plaintiff's discomfort "d[id]

not have a true radiculopathic component to it." (AR 367.) He also stated that he planned to have the Plaintiff "evaluated by pain management for consideration of local steroid injections." (AR 367.) On June 19, 2006, the Plaintiff had a follow-up appointment with Dr. Palumbo. (AR 366.) Dr. Palumbo found that "there [wa]s not significant pathology located within the hip joint" or in the lumbar spine and stated that he would "not recommend any procedures directed toward her back surgically." (AR 366.)

Prior to Dr. Palumbo's final diagnosis, on May 17, 2006, the Plaintiff began seeing Dr. Craig L. Shalmi, M.D. ("Dr. Shalmi"), a pain management specialist. (AR 327–29.) Dr. Shalmi diagnosed the Plaintiff with sacrolitis, facet anthropathy/syndrome, lumbar degenerative disc disease and radicular syndrome of her lower limbs. (AR 327–29.) He indicated that the Plaintiff's "pain [was] located in the lumbar spine, [h]ip," which was "described as [a]ching, [b]urning, [s]tabbing [and] [t]hrobbing." (AR 327.) The pain's severity averaged an eight on a scale of ten. (AR 327.) According to Dr. Shalmi, "[t]he pain [was] constant with freq[uent] exacerbations." (AR 327.) Aggravating factors included standing and sitting. (AR 327.)

By June 12, 2006, Dr. Shalmi had prescribed for the Plaintiff Zanaflex, Lunesta, Vicodin, Estrogen, Advair Diskus, Combivent, Albuterol and Prozac. (AR 331.) On July 20, 2006 and August 15, 2006, the Plaintiff saw Dr. Shalmi for sacroiliac joint injections. (AR 334–38.) However, on August 21, 2006, Dr. Shalmi observed that "these 2 injections have not yet yielded results." (AR 339.) The Plaintiff still complained of "pain in the right low back with referral into the right groin and the right leg as far as the knee and intermittently into the ankle." (AR 339.) She also complained that she was waking up with pain and of more widespread aches in the shoulders, legs and knees. (AR 339.)

At about this time, on July 26, 2006, Dr. Rogaschefsky notified First Unum that the Plaintiff was "temporarily totally disabled," but that he "expect[ed] fundamental changes in [her] medical condition" in five to six months. (AR 173.)

On October 17, 2006, Dr. Shalmi performed surgery on the Plaintiff's "right L3-4, L4-5 and L5-S1." (AR 518.) The procedure performed was "lumbar selective nerve root block, transforaminal and fluoroscopically guided with injection of contrast and acquisition of root-o-grams." (AR 518.) Dr. Shalmi performed the same procedure a second time on November 2, 2006. (AR 521.) On November 7, 2006, the Plaintiff had a follow up appointment with Dr. Shalmi. (AR 523.) He noted that the Plaintiff's function was mildly impaired and that her pain scores were high. (AR 523.) The Plaintiff had another follow up appointment with Dr. Shalmi on December 18, 2006. (AR 526.) Again, Dr. Shalmi noted that the Plaintiff's function was mildly impaired and that her pain scores were high. (AR 526.) "The pain [was] described as on the right, in the region of the low back[,] the hip and into the RUE in a proximal distribution." (AR 526.)

On January 4, 2007 and February 6, 2007, Dr. Shalmi performed "lumbar intraarticular facet injections with fluoroscopic guidance" on the Plaintiff's "[r]ight L2-L3, L3-L4, L4-L5 and L5-S1." (AR 531, 602.) On February 14, 2007, the Plaintiff visited Dr. Shalmi, who observed that the Plaintiff "ha[d] not gotten relief with [the] two sets of diagnostic facet injections," but that the Plaintiff "did notice some improvement in the region of the right hip bursa following an injection there at the time we did her last facet injections." (AR 604.) Dr. Shalmi further noted that the Plaintiff "ha[d] some pain and tenderness in the iliotibial band on the right" and "[wa]s complaining a lot of low back pain bilaterally with right lower extremity down about as far as the

distal calf to the ankle." (AR 604.) The Plaintiff's "gait remain[ed] antalgic" and "[t]he lumbosacral range of motion [was] uncomfortable and limited." (AR 604.)

Dr. Shalmi assessed her condition as facet arthropathy/syndrome and bursitis. (AR 604.) He explained that the Plaintiff was "continu[ing] to have a good deal of pain and dysfunction [in] regards [to] her low back pain" and "ha[d] failed conservative management thus far." (AR 604.) Dr. Shalmi recommended "diagnostic diskography [for the Plaintiff] to identify a discogenic source of pain and direct treatment at that level." (AR 604.)

Thereafter, on March 5, 2007, Dr. Shalmi observed that the Plaintiff "had a degree of relief with her first bursa injection" but that "[s]he report[ed] two days of dramatic symptom improvement after which the pain began returning." (AR 606.) According to Dr. Shalmi, the Plaintiff's pain "[wa]s essentially unchanged." (AR 606.) Dr. Shalmi again noted that he had suggested that the Plaintiff "com[e] in for diagnostic diskography to evaluate if there may be an element of discogenic pain involved and her overall pain syndrome." (AR 606.) However, this procedure had to await authorization. (AR 606.)

On March 26, 2007, the Plaintiff visited again with Dr. Shalmi. He stated that the Plaintiff "ha[d] failed conservative management" and "ha[d] had nonsustained relief with much of what [wa]s done [including the various injections] and continue[d] to have severe low back and proximal lower extremity pain." (AR 608.) At this appointment, the Plaintiff expressed interest in pursuing diagnostic diskography. (AR 608.)

By April 23, 2007, the Plaintiff was authorized to undergo the diagnostic diskography. (AR 610.) Dr. Shalmi still assessed back pain and facet arthropathy/syndrome but ruled out discogenic syndrome. (AR 610.) The Plaintiff continued to "complain[] of pain across her low back with pain into both legs, [which] refer[red] down into her thigh [] bilaterally." (AR 610.)

On May 17, 2007, the Plaintiff had the diskography performed.  (AR 615.)  The diskography was negative at L2-L3 and L3-L4 but positive at L4-L5 and L5-S1.  (AR 615.)  In this regard, at L4-L5 there was a "central disc protrusion and annular tear," while at L5-S1 there was a "disc bulge with superimposed left lateral protrusion narrowing the right neural foramen with apparent contact of the exiting right L5 nerve root."  (AR 615.)   The diskography also revealed "[b]ilateral L5 spondylolysis with minimal anterolisthesis of L5 on S1."  (AR 615.)  Based on these results and the Plaintiff's history, Dr. Shalmi felt that the Plaintiff was "a good candidate for a minimally invasive procedure for disk decompression."  (AR 616.)

On September 21, 2007, the Plaintiff had a follow-up appointment with Dr. Shalmi.  (AR 1267.)  Dr. Shalmi assessed discogenic syndrome not otherwise specified and bursitis of the hip.  (AR 1267.)  He noted that the Plaintiff had received authorization for nucleoplasty of the L4-5 and L5-S1.  (AR 1267.)  However, the Plaintiff "[wa]s awaiting the results of some medical studies on her husband, who ha[d] an aortic aneurysm" to see whether or not he would require surgery.  (AR 1267.)  Thus, she told Dr. Shalmi that "she [would] let [him] know when she want[ed] to schedule the nucleoplasty."  (AR 1267.)  Similarly, at the January 9, 2008 appointment, the Plaintiff was still "awaiting word on her husband's possible need for aneurysm surgery and therefore d[id] not want to move forward with any procedure on her back until she ha[d] a better idea of what her time requirements are going be in the near future."  (AR 1819.)  She stated she would know in about two weeks and that they could schedule her procedure then.  (AR 1819.)  However, by April 29, 2008, the Plaintiff had still not scheduled the procedure, because she was caring for an elderly family member and was unable to go through the recovery period for nucleoplasty.  (AR 1983.)

On July 20, 2007, August 20, 2007, November 14, 2007, January 9, 2008 and February 28, 2008, the Plaintiff received additional trigger point injections in the right bursa. (AR 1262, 1265–66, 1817–20, 1962–63.) At the August 20, 2007 appointment, Dr. Shalmi noted that the Plaintiff "did get very good relief following the first injection, though some of her pain has receded." (AR 1265.) Dr. Shalmi further observed that the Plaintiff was "still getting cramping in the legs at night" and "her back pain [wa]s unchanged." (AR 1265.) At the January 8, 2008 appointment, Dr. Shalmi observed that the Plaintiff had some worsening of right-sided hip pain and [that] previous injections ha[d] worked well for [] giving her sustained and significant relief of symptoms." (AR 1819.) On February 28, 2008, Dr. Shalmi again noted that "the Plaintiff "ha[d] received good benefit from injections in the past" and sought authorization for the Plaintiff to begin receiving aquatherapy. (AR 1962.)

At a follow-up appointment on March 27, 2008, Dr. Shalmi assessed that the Plaintiff "ha[d] chronic bursitis with lumbosacral radiculopathy[,] . . . a central disc herniation at L4/5 and forarnenal narrowing at L5/S1[,] . . . [and] a positive discography[.]" (AR 1964.) The Plaintiff's pain "[wa]s in the lumbar region, radiating around her right hip and into her anterior thigh." (AR 1964.) "She also ha[d] palpable pain in the right hip [and] [could not] lay on that side." (AR 1964.) The Plaintiff received "good relief of pain" for about seven to ten days from the bursa injections. (AR 1964.) In addition, she received temporary relief from visiting a chiropractor three times a week and getting a massage once a week. (AR 1964.) Dr. Shalmi gave a similar assessment of the Plaintiff's condition following her follow-up appointment on April 25, 2008. (AR 1966.) In addition, at the April 25, 2008, appointment, the Plaintiff informed Dr. Shalmi that she swam, which "help[ed] her strength and endurance" and "[wa]s not stressful to her back" nor "exacerbate[d] her hip pain." (AR 1966.)

On May 19, 2008, the Plaintiff began seeing Dr. Andrea Coladner, D.O. ("Dr. Coladner"), a physiatrist. (AR 2250.) The Plaintiff "complain[ed] of low back pain centralized and radiating to the right, right buttock pain, right lower extremity pain, occasional right ankle pain[] [and] a lot of difficulty sleeping even with medication." (AR 2250.) She told Dr. Coladner during this initial evaluation that she had received multiple injections to her back and hip, including one three weeks prior to the appointment, but they provided her "with no relief" and "did not help at all." (AR 2250.) Dr. Coladner noted that the Plaintiff had a "partial disability" and that the prognosis was "poor." (AR 2252.) The Plaintiff saw Dr. Coladner for re-evaluations on June 16, 2008, July 28, 2008, September 15, 2008 and October 29, 2008. At these appointments, Dr. Colander made similar findings as those she made at the May 19, 2008 initial meeting. (AR 2254–72.) She also recommended acupuncture treatment and an EMG/NCV study of the bilateral lower extremities. (AR 2254–72.) However, it appears that the Plaintiff agreed not to have the EMG/NCV study done at a Workers' Compensation hearing, so it was never conducted. (AR 2384.)

On December 10, 2008, the Plaintiff had another re-evaluation with Dr. Coladner. (AR 2273.) The Plaintiff continued to "report[] low back pain," as well as persistent "right hip pain." (AR 2273.) The Plaintiff informed Dr. Coladner that "she d[id] not take the pain medication often because it ma[de] her feel 'loopy.'" (AR 2273.) According to Dr. Coladner, the Plaintiff's prognosis continued to be poor and the Plaintiff still had a partial disability. (AR 2274–75.) Dr. Coladner recommended the Plaintiff continue with chiropractic care, massage therapy and her current medications. (AR 2275.) The Plaintiff had additional re-evaluations with Dr. Coladner on January 21, 2009 and March 6, 2009. (AR 2277–83.)

## C.  The Plaintiff's Social Security Disability Insurance Benefits

On June 15, 2006, the Plaintiff filed a claim for social security disability insurance benefits.  (AR 770.)   The Division of Disability Determination referred the Plaintiff to Dr. Samir Dutta, M.D. ("Dr. Dutta") for an orthopedic evaluation.  (AR 1164.)  On August 28, 2006, Dr. Dutta examined the Plaintiff.  (AR 1164.)  Dr. Dutta noted that the Plaintiff's activities of daily living included cooking, cleaning, laundry, shopping, showering herself, bathing herself, dressing herself, watching television, listening to the radio and reading.  (AR 1165.)  He also observed that the Plaintiff appeared to be in no acute distress.  (AR 1165.)  The Plaintiff's gait and station were normal, and she could walk on her heals and toes without difficulty, squat fully and rise from a chair without difficulty.  (AR 1165.)  Further, she needed neither an assistive device nor help in changing for the exam or getting on and off the exam table.  (AR 1165.)  According to Dr. Dutta, the Plaintiff's prognosis was "stable" and "[s]he ha[d] no limitation for sitting or standing."  (AR 1167.)  However, she did have "mild to moderate limitation of walking and lifting weight on a frequent basis."  (AR 1167.)

The SSA referred the Plaintiff's claim to the Office of Special Investigations because "[t]he alleged limitations in function [we]re not consistent with the available medical evidence."  (AR 1253.)   The investigation revealed that on August 28, 2006, the Plaintiff was observed at around 11:25 a.m. leaving the site of her consultative exam.  (AR 1253.)  The Plaintiff drove herself and a male passenger to the Medford Shopping Plaza, which was about ten to twelve minutes away.  (AR 1253.)  The Plaintiff and her male companion left the car and entered "Island Recreational VIP Club."  (AR 1253.)  "The two left Island Recreational about 15 minutes later with the [Plaintiff] carrying what looked like pamphlets, booklets, and the like."  (AR 1254.)

The Plaintiff then drove herself and her male companion to her house, arriving at about 12:19 p.m. (AR 1254.) Once the Plaintiff parked in the driveway, "[s]he [] opened the door and held it so with her left foot as she stretched back and twisted behind her to reach several items in the rear seat." (AR 1254.) "She then gathered a few other things including her jacket from the front seat and got out of the car." (AR 1254.) The Plaintiff and her companion "walked up a short incline that led to the home's front stairs." (AR 1254.) The Plaintiff "climbed the six or so steps barely holding onto the railing" and entered the house (AR 1254.) The observation ended shortly thereafter. (AR 1254.)

The Investigation Report concluded:

> While she was observed the subject appeared to be alert and engaged in her surroundings. She did not look noticeably tired. Her gait, station and pace seemed to be normal. She appeared to have no difficulty getting into and out of her car or stretching back to reach the items in the rear seat. It seemed that as she did so more force was being exerted by her right leg to help stabilize her position.
> The subject was not noted to stop and rest as she walked. The degree to which she may have been experiencing physical pain was not clear; she was not in any obvious discomfort.

(AR 1254.) As such, the SSA made a special determination that the Plaintiff's "allegations of severely limited activities of daily living [we]re not credible." (AR 765.)

In a letter dated October 6, 2006, the SSA denied the Plaintiff's social security disability insurance claim. (AR 1292.) The SSA informed the Plaintiff that she did not qualify for benefits because she was not disabled under the SSA's rules. (AR 1292.) It further explained:

> You said you were disabled due to low back and hip pain. The medical evidence shows that you have arthritic changes and pain in your low back and hips for which you receive medical treatment. However you have no muscle spasm, muscle weakness or nerve involvement. You are able to care for your personal needs and have no limitations in sitting or standing.

You were observed driving, entering and exiting your car and walking without any apparent discomfort, assistance or restriction of motion.

Based on your description of your past job as a PHLEBOTOMIST that you performed in the past 15 years, we have concluded that you can return to this job.

(AR 1294.)

On June 15, 2007, an Administrative Law Judge ("ALJ") reversed the SSA's denial of disability insurance benefits and granted benefits to the Plaintiff. (AR 770–75.) In making this decision, the ALJ considered the findings of Dr. Ossvaldo Fulco, M.D. ("Dr. Fulco"), who, after reviewing the medical record, found that the Plaintiff "ha[d] degenerative disease of the lumbar spine, with disc herniation at L4-5 and stenosis as revealed by a MRI scan." (AR 771.) Dr. Fulco also found that the Plaintiff "ha[d] right hip pain following a fall at work." (AR 771.) According to Dr. Fulco, the Plaintiff "[wa]s able to sit and stand/walk no more than two hours each in an eight-hour work day and [wa]s unable to lift/carry more than ten pounds." (AR 771.) However, it does not appear that the ALJ considered SSA's investigation, as it is not mentioned in his decision. (AR 770–75.)

## D. The Plaintiff's Claim for Workers' Compensation Benefits

On March 21, 2007, the Workers' Compensation Board of the State of New York ("the Board") determined that the Plaintiff had a work related injury, including rib contusion and injuries to her back, right hip, right knee and right ankle. (AR 2325.) Accordingly, the Plaintiff received workers' compensation benefits for her lost wages for the 35.6 week period of December 22, 2006 to September 4, 2008. (AR 2327–32.)

On September 12, 2008, the Board determined that the Plaintiff was partially disabled as a result of her work-related injury. (AR 2331.) The Board further directed that the Plaintiff continue to receive workers' compensation benefits. (AR 2231–32.)

**E.  The Plaintiff's Claim for Long-Term Disability Benefits**

In a letter dated November 8, 2006, First Unum approved the Plaintiff's long-term disability claim and awarded her benefits retroactively to June 20, 2006.  (AR 400–03.)  The letter included the Plan's provisions regarding long-term disability benefits, as stated above.  (AR 400–01.)  First Unum explained that "[i]n order to qualify for ongoing benefits, [the Plaintiff] must continue to meet the definition of disability."  (AR 401.)  First Unum further explained that it would "periodically . . . request medical evidence and vocational information to support the continuation of [the Plaintiff's] disability."  (AR 401.)

On September 21, 2007, First Unum notified the Plaintiff that it was "continuing [its] review of [her] Long Term Disability claim" and that the Plaintiff needed to "continue to meet the policy definition of 'disabled' in order to maintain [her] benefit eligibility."  (AR 755.)  Thereafter, on July 10, 2008, First Unum told the Plaintiff that "a recent review of [he]r claim indicate[d] that [she] may no longer meet the [Plan's] definition of disability."  (AR 2016.)  In this regard, First Unum found that "[the Plaintiff's] current functional capacity [wa]s unclear" and that they needed to send the Plaintiff "for a Functional Capacity Evaluation [("FCE")] to clarify [he]r capacity."  (AR 2017.)

On September 26, 2008, First Unum informed the Plaitniff "that it [was] unable to continue paying benefits."  (AR 2210.)  In making this determination, First Unum reviewed the Plaintiff's medical records, including those connected with her social security disability insurance claim, as well as the opinions of consultative examiners, the Plaintiff's treating physicians and vocational speicialists.  (AR 2210–15.)

In this regard, in April 2008, Dr. Lucia McPhee, M.D. ("Dr. McPhee") provided First Unum with a medical consultant review of the Plaintiff's claim.  (AR 1874–94.)  Dr. McPhee

reviewed the Plaintiff's entire file and prepared a detailed report. (AR 1874–94.) Dr. McPhee concluded that "[t]he extensive medical information available for review d[id] not support that the [Plaintiff] would not have the functional capacity to perform occupational requirements that would include [(1)] occasionally exerting up to 10 pounds of force to lift, carry, push, pull and otherwise move objects[;] [(2)] frequently exert[ing] negligible amount of force to lift, carry, push, pull and otherwise move objects[;] and [(3)] sit[ting] for six hours per eight hour work day with brief periods of standing and walking." (AR 1893.)

In reaching this conclusion, Dr. McPhee noted that "[the Plaintiff] frequently reported 8/10 pain, and sometimes 10/10 pain when she was at medical appointments, although she was described as being in no apparent distress." (AR 1891.) She also opined that "if there was significant degenerative disc disease, [she] would expect some paraspinal muscle spasms," but yet on December 22, 2005, "Dr. Rogaschefsky reported that there were no muscle spasms, and spine range of motion was intact." (AR 1891.) Dr. Rogaschefsky also did not mention any spasms on January 13, 2006, April 19, 2006 or June 19, 2006. (AR 1891.) In addition, neither Dr. Shalmi nor Dr. Dutta indicated that the Plaintiff had experienced any muscle spasms. (AR 1891.) Dr. McPhee further noted that "[she] would have expected sympathetic changes in heart rate and blood pressure" in connection with the May 17, 2007 diskography that was positive at the L4-L5 and L5-S1 levels, but yet, "Dr. Shalmi [] reported that these levels 'did not produce significant alterations of sympathetic tone as heart rate and blood pressure remained mostly unchanged." (AR 1891.)

Furthermore, "[i]f the [Plaintiff] did have significant pain associated with the disc degeneration, and her pain was 8/10 in severity, such that physical function was significantly impaired by the pain, [Dr. McPhee] would have expected [the Plaintiff] to have proceeded with

the percutaneous nucleoplasty." (AR 1891–92.) This procedure was approved sometime before her follow up visit with Dr. Shalmi on September 21, 2007, and yet, as of February 22, 2008, the Plaintiff had not scheduled the procedure, because of medical issues related to her husband and mother. (AR 1891.) Moreover, Dr. McPhee believed that the "day to day activities as described by the [Plaintiff] during multiple telephone conversations with [First Unum], as well as reportedly observed [during the SSA's investigation], [we]re not consistent with 8/10 pain as she would usually describe." (AR 1891.)

On April 22, 2008, Dr. McPhee wrote a letter to Dr. Rogaschefsky in which she indicated that her "extensive file review of over 1800 pages . . . d[id] not support total disability." (AR 1919–20.) Rather, Dr. McPhee believed "that the [Plaintiff] could sit for a total of six hours per eight hour workday with position change as needed, which [wa]s likely closer to that which she [wa]s doing at home based on her description of her activities." (AR 1920.) She also believed "that [the Plaintiff] could occasionally exert up to 10 pounds of force to lift, carry, push, pull and otherwise move objects, frequently exert negligible amount of force to lift, carry, push, pull and otherwise move objects, and stand/walk for up to a total of two hours per eight hour workday, for brief periods at a time." (AR 1920.)

Dr. McPhee informed Dr. Rogaschefsky that if he agreed with her letter, he did not need to respond, but if he wished to express a different opinion, he was welcome to write his comments directly on the letter or send a response statement under a separate cover. (AR 1920.) On May 23, 2008, Dr. Rogaschefsky signed and returned the letter. (AR 1920.) Significantly. he provided no comments or statement that would indicate that his opinion differed from Dr. McPhee's. (AR 1920.)

On June 13, 2008, the Plaintiff's chiropractor, Dr. Daniel Scuttaro, D.C. ("Dr. Scuttaro"), provided answers to a series of questions sent to him by First Unum concerning the Plaintiff's condition. (AR 1944–46.) He stated that the Plaintiff's current diagnosis included a lumbar intervertebral disc injury, seratic neuritis, lumbosacral sprain/strain and muscle spasm. (AR 1944.) He determined that the Plaintiff could occasionally lift, carry, push or pull up to ten pounds and could occasionally walk and/or stand for brief periods of time. (AR 1944–45.) However, he did not feel the Plaintiff could frequently lift, carry, push or pull a negligible amount or frequently sit with the ability to change positions as needed. (AR 1945.) According to Dr. Scutaro, "[f]requent lifting, carrying, pushing or pulling [would] exacerbate th[e] [Plaintiff's] condition[,] [a]s [would] frequent sitting." (AR 1945.) Dr. Scutaro concluded that the Plaintiff's current functional ability was limited to just one to two hours of sedentary activity during the course of an eight hour workday. (AR 1946.) Sedentary activity was defined as "10 lbs. maximum lifting or carrying articles. Walking standing on occasion. Sitting 6/8 hours." (AR 1946.) He did not expect there to be a significant change in the Plaintiff's functional ability. (AR 1946.) On June 27, 2008, in a phone conversation with Dr. McPhee, Dr. Scutaro further opined that "he did not think [the Plaintiff] could tolerate sitting for one hour at a time on a regular basis," and noted that "[the Plaintiff] d[id] try to be active within limitations." (AR 2212.)

On June 18, 2008, Dr. Shalmi also responded to First Unum's questions. (AR 1960–61.) He identified the Plaintiff's current diagnosis as being (1) face arthropathy/syndrome; (2) lumbosacral radiculopathy; (3) bursitis of the hip; and (4) radicular syndrome in the lower limbs. (AR 1960.) Dr. Shalmi stated that the Plaintiff's "current restrictions and limitations" was "patient not working." (AR 1960.) On June 26, 2008, in a phone conversation with Dr. McPhee,

Dr. Shalmi's office noted that the Plaintiff "appear[ed] to be very proactive in trying to deal with [her] pain" and "[she] tr[ied] to stretch on a regular basis and swim regularly." (AR 1982–83, 2212.) However, during office visits, the Plaintiff "appear[ed] uncomfortable and change[d] position a lot[.]" (AR 2212.) Further, Dr. Shalmi's office did not have adequate information on which to base activity restrictions and often referred patients to other providers "in order to safely determine reasonable activity." (AR 1982–83, 2212.)

Dr. McPhee reviewed this additional information provided by the Plaintiff's treating physicians and prepared an addendum response, dated July 2, 2008. (AR 1978–84.) She stated that "[i]n terms of the next step, given that the [Plaintiff] was already awarded [social security disability benefits], and Dr. Scutaro is still of the opinion that the [Plaintiff] could not adequately tolerate sitting for sedentary type activity, further consideration should be given to an FCE." (AR 1983.)

On September 5, 2008, Jangwhon Yoon, P.T., M.A. ("Yoon") conducted an independent FCE of the Plaintiff. (AR 2173–84.) The test lasted three hours and two minutes and included short pauses of two to three minutes between the tasks. (AR 2175.) The FCE revealed that the Plaintiff was capable of (1) sitting and standing frequently, or one-third to two-thirds of the day; (2) exerting up to twenty pounds of force occasionally, or up to one-third of the day; and (3) exerting up to ten pounds frequently, or one-third to two-thirds of the day. (AR 2173, 2177.) Thus, Yoon concluded that the Plaintiff "[wa]s capable of sustaining the Light level of work for an 8-hour day/40-hour week." (AR 2173.) Light work entails "[p]hysical demand requirements [] in excess of those for Sedentary Work." (AR 2173.)

In addition, on June 9, 2008, on behalf of First Unum, the Plaintiff's medical record was reviewed by Norma Parras-Portenzo ("Parras-Portenzo"), a Senior Vocational Rehabilitation

Consultant. (AR 1937.) She found that "the [Plaintiff] ha[d] skills transferable to alternate occupations that would require occasional exertion up to 10 lbs. occasional and are performed primarily from a seated position during the workday." (AR 1937.) Moreover, on September 22, 2008, Vocational Rehabilitation Consultant Penny Letichevsky ("Letichevsky") conducted a vocational assessment for First Unum to assess the Plaintiff's education, training and/or experience to determine whether she could perform other occupations. (AR 2201.) Letichevsky determined, based on the Plaintiff's prior work history, skills, education and training, as well as her geographic location, that the Plaintiff's vocational options included medical receptionist, blood bank credit clerk and patient appointment clerk. (AR 2201–05.) Letichevsky noted that these occupations were performed in an office setting and "would allow the [Plaintiff] to change positions as needed by either using a sit/stand work station or by taking micro-breaks by performing such activities as copying, faxing and using the rest room or getting a beverage." (AR 2204.)

**F.  The Plaintiff's Administrative Appeal**

On March 24, 2009, the Plaintiff, by her counsel, appealed First Unum's September 26, 2008 denial of long-term disability benefits and included new documentation from Dr. Coladner concerning the Plaintiff's condition. (AR 2245–83.) In her appeal letter, the Plaintiff argued that "[t]he medical evidence, from a physical perspective, establishes [that] the [Plaintiff] is severely impaired[.]" (AR 2246.) She also argued that "[p]reference should be afforded to Dr. Shalmi and Dr. Coladner's medical opinion concerning the nature and severity of the [Plaintiff's] musculoskeletal impairments considering (1) the length of the treatment relationship, (2) the frequency of her examinations, (3) the existence of significant clinical findings that support the

doctor's opinion, and (4) the doctor's specialization in the medical field, i.e. orthopedics and physiatry, respectively, in which said impairments lie."  (AR 2247.)

In contrast, the Plaintiff asserted that "little probative weight, if any at all, should be afforded to the assessment of physical capacities offered by [Dr. McPhee], since said [assessments] were completed without the benefit of opportunity to review all the medical evidence currently contained in the record."  (AR 2247, emphasis eliminated.)  The Plaintiff concluded that she "[could not] perform her past relevant work and her remaining occupation base for sedentary work [wa]s so significantly eroded as to preclude the performance of any alternative substantial gainful activity existing in significant numbers in the nation's economy." (AR 2247.)

The Plaintiff's appeal also included a functional vocational assessment completed by vocational assessment expert Andrew J. Pasternak, M.A., C.R.C. ("Pasternak").  (AR 2442–52.) The assessment occurred on March 19, 2009 and lasted for two hours and 40 minutes.  (AR 2442–43.)  "[B]ased upon a complete employability analysis, including the results of the various vocational tests administrated," Pasternak determined that the Plaintiff "[wa]s incapable of performing the duties of her former position as a Blood Donor Specialist."  (AR 2249.) Pasternak also criticized the FCE performed on September 5, 2008, opining that "there are some severe limitations in their practicality along with inconsistences."  (AR 2250.)

In a report dated April 21, 2009, Dr. Andrew C. Krouskop, M.D. ("Dr. Krouskop"), who was Board Certified in Physical Medicine and Rehabilitation.  (AR 2363–77) reviewed the Plaintiff's claim for First Unum.  In doing so, he considered all of the Plaintiff's medical records. (AR2363–77.)  Dr. Krouskop assessed that (1) "[t]he [Plaintiff's] right hip trochanteric bursitis would support avoiding all right sideline positioning"; (2) "[t]he [Plaintiff's] back condition

would support a 10 to 15 pound lifting restriction and no repetitive bending/twisting/stooping";
(3) "[t]he [Plaintiff's] cervical condition would support no repetitive overhead lifting but no
additional lifting restrictions;" and (4) "[n]o additional restrictions for sacroiliitis." (AR 2373.)
He concluded that "the above listed restrictions would be consistent with what the [Plaintiff] was
capable of performing during the FCE." (AR 2373.)

On April 21, 2009, Dr. Krouskop faxed a letter to Dr. Coladner. (AR 2383–85.) In the
letter, he asked her why she no longer felt EMG studies were needed, when she had
recommended EMG studies on May 19, 2008. (AR 2384.) Dr. Coladner answered that the
Plaintiff had agreed not to have EMG studies at a workers' compensation hearing, so it was
never further pursued. (AR 2384.) In addition, Dr. Krouskop requested that Dr. Coladner list
the abnormal physical conditions or findings that would prevent the Plaintiff from performing
sedentary activity; Dr. Coladner replied "[lumbar injury 30% of [normal range of motion with]
pain." (2384.)

However, Dr. Krouskop ultimately found that these "responses [we]re insufficient to
change the opinions expressed in his April 21, 2009 report. (AR 2391.) In this regard, Dr.
Krouskop reasoned "Dr. Coladner's responses suggest that she was not inclined to further
evaluate the right plantar flexor weakness with electrodiagnostic studies[,]" which "would help
confirm the presence of a radiculopathy." (AR 2391.) Dr. Coladner also "reported not checking
for any atrophy of the right gastrocnemius, which would be present in a chronic, impairing S-1
radiculopathy." (AR 2391.)

On May 4, 2009, Dr. Thomas E. Davis, M.D. ("Dr. Davis"), who was Board Certified in
Physical Medicine and Rehabilitation, provided First Unum with a second opinion concerning
the Plaintiff's condition. (AR 2394–401.) Dr. Davis agreed with Dr. Krouskop's conclusion

regarding the Plaintiff's restrictions and limitations, "which was avoiding all right side-lying positioning, 10 to 15 pound lifting restriction and no repetitive bending/twisting stooping." (AR 2399.) Dr. Davis further noted that Dr. Krouskop's opinion was consistent with the opinions of Dr. Dutta, Dr. Rogaschefsky and the FCE. (AR 2399.) Thus, Dr. Davis disagreed with Dr. Colander's opinion that the Plaintiff suffered from a "partial disability," because the opinion "[wa]s non-specific regarding function and "1-2 hours of sedentary ability [wa]s not consistent with abilities noted during FCE, reported [activities of daily living] and known pathology." (AR 2399.)

In addition, on May 6, 2009, First Unum received a report, dated June 5, 2008, from Dr. Iqbal Merchant, M.D. ("Dr. Merchant"), a neurologist. (AR 2406–13.) On June 5, 2008, Dr. Merchant performed a physical examination of the Plaintiff. (AR 2410.) During this examination, the Plaintiff did not appear to be in acute distress. (AR 2410.) He noted "moderate tenderness . . . to palpation at the paralumbar muscles bilaterally," but observed no muscle spasm. (AR 2411.) According to Dr. Merchant, the Plaintiff suffered from a lumbar spine herniated disc at the L4-5 level, but that this condition was "resolving." (AR 2411.)

Both Dr. Krouskop and Dr. Davis considered the report of Dr. Merchant. (AR 2431–33, 2435–38.) In this regard, on May 11, 2009, Dr. Krouskop reported that while "Dr. Merchant's evaluation notes the [Plaintiff] ha[d] diffuse weakness throughout the right lower extremity," this "would not correlate with the [Plaintiff's] lumbar CT scan findings of 5/07." (AR 2433.) Dr. Krouskop also pointed out that Dr. Merchant "d[id] not attempt to explain an etiology for the right lower extremity weakness[,] . . . d[id] not recommend electrodiagnostic studies to evaluate the right lower extremity weakness[,] [and] d[id] not list any specific restrictions for the [Plaintiff] as of 6/5/08." (AR 2433.) Accordingly, Dr. Krouskop did not find the additional

information from Dr. Merchant sufficient to change his opinion in his April 2009 report. (AR 2433.)

Likewise, on May 12, 2009, Dr. Davis reported that the new information from Dr. Merchant did not alter his conclusion in his May 4, 2009 report. (AR 2437.) Dr. Davis believed that Dr. Merchant's evaluation was "concerning" because "he d[id] not define areas of weakness as reflected in his examination." (AR 2437.) He explained that "[t]his whole leg weakness would be concerning for a non-physiologic etiology which also would be consideration for 'patchy distribution weakness.'" (AR 2437.) Further, Dr. Merchant did not give an opinion with regard to capacity, restrictions/limitations or impairment. (AR 2437.)

On May 26, 2009, Richard Byard, a Senior Vocational Rehabilitation Consultant, on behalf of First Unum, submitted a vocational assessment of the Plaintiff and considered Pasternak's report. (AR 2455–57.) Byard concluded that the September 22, 2008 FCE "laid out the underlying rationale supporting the [Plaintiff's] suitability for entry-level positions in the Medical Receptionist, Blood Bank Credit Clerk, and Patient Appointment Clerk occupations." (AR 2456.) He found that "[t]he results of [] Pasternak's evaluation would not serve to change the results of this prior Vocational Assessment." (AR 2456.)

By letter dated June 2, 2009, First Unum notified the Plaintiff that it had completed the appellate review of its denial of the Plaintiff's long-term disability claim and that it had "determined that the original decision to deny [the Plaintiff's] claim was appropriate." (AR 2460–64.) First Unum explained that "[b]ased on [its] evaluation of the totality of evidence including information not available to the SSA at the time of their decision, . . . [the Plaintiff] has the capacity to perform alternative, gainful occupations." (AR 2464.)

## G. The Instant Case

On July 9, 2010, the Plaintiff commenced this action by filing a Complaint against the Defendants in the Eastern District of New York. The Complaint only concerned her entitlement to long-term disability benefits under the Plan. By stipulation "So Ordered" by this Court on August 12, 2011, the Plaintiff was permitted to amend her Complaint in order to state a claim to recover RIP benefits allegedly also due to her under the Plan. The Stipulation stated that the "Defendants' First Defense in their answer does not apply to [the Plaintiff's] claim for RIP benefits." (August 12, 2011 Stipulation, ¶ 1.) The First Defense in the Defendant's answer states

> Plaintiff has failed to state a claim upon which relief can be granted, to the extent plaintiff asserts a claim seeking to recover any relief other than: (a) monthly benefits allegedly due under the Policy, as to which an administrative determination has previously been made, and as to which plaintiff has exhausted her administrative remedies; or (b) other relief specifically provided for in ERISA.

(Answer, First Defense.) However, the Stipulation states that "the responses in [the] [D]efendants' Answer regarding [the] [P]laintiff's allegations that she is entitled to additional long-term disability benefits shall be deemed to include denials that [the] [P]laintiff is entitled to additional RIP benefits." (Stipulation, ¶ 2.)

## II. DISCUSSION

## A. Legal Standard

### 1. Summary Judgment Standard

It is well-settled that summary judgment is proper only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The burden of showing the absence of any genuine dispute as to a material fact rests with the party seeking summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted); see also Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, 628 F.3d 46, 51 (2d Cir. 2010)  ("Where, as here, there are cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'") (quoting Morales, 249 F.3d at 121).

"Summary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA."  See Alfano v. CIGNA Life Ins. Co. of New York, 07 Civ. 9661 (GEL), 2009 U.S. Dist. LEXIS 7688, at *37–38 (S.D.N.Y. Jan. 30, 2009) (collecting cases).  "In such an action 'the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA.'"  Id. (quoting Ludwig v. NYNEX Service Co., 838 F. Supp. 769, 780 (S.D.N.Y. 1993)).

### 2.  ERISA Standard

Section 502(a)(1)(B) of ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  Metropolitan Life Ins. Co. v. Glenn, 128

S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008) (citing 29 U.S.C. § 1132(a)(1)(B)). The Second

Circuit has explained that where the plan "grants the administrator discretionary authority to

determine eligibility benefits, a deferential standard of review is appropriate." McCauley v. First

Unum Life Ins. Co., 551 F.3d 126, 132 (2d Cir. 2008) (citing Glenn, 128 S. Ct. at 2348). "Under

the deferential standard, a court may not overturn the administrator's denial of benefits unless its

actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by

substantial evidence or erroneous as a matter of law.'" Id. (quoting Pagan v. NYNEX Pension

Plan, 52 F.3d 438, 441 (2d Cir. 1995)). "Substantial evidence is 'such evidence that a

reasonable mind might accept as adequate to support the conclusion reached by the

[administrator and] . . . requires more than a scintilla but less than a preponderance.'" Celardo v.

GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003) (quoting Miller v.

United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995)).

In reviewing a claim under Section 502(a)(1)(B), "the court should consider only the

evidence in the administrative record unless good cause for considering additional evidence is

shown." Alfano, 2009 U.S. Dist. LEXIS 7688, at *40 (citing Connors v. Connecticut Gen. Life

Ins. Co., 272 F.3d 127, 134–35 (2d Cir. 2001), and DeFelice v. Am. Int'l Life Ass. Co. of New

York, 112 F.3d 61, 66–67 (2d Cir. 1997)). The Court's review of the administrative record

"must include a searching and careful determination as to whether the conclusion reached by the

administrator in view of the facts before it was indeed rational and not arbitrary." Rappa v.

Connecticut General Life Ins. Co., 06-CV-2285 (CBA), 2007 U.S. Dist. LEXIS 91094, at *27

(E.D.N.Y. Dec. 11, 2007) (quoting Rizk v. Long Term Disability Plan of Dun & Bradstreet

Corp., 862 F. Supp. 783 (E.D.N.Y. 1994)).

**B.  As to the Plaintiff's Long-Term Disability Benefits Claim**

There is no dispute that the Plan grants First Unum the discretionary authority to interpret the terms of the Plan and to determine a claimant's eligibility for benefits.  Nevertheless, the Plaintiff claims that the Defendants' decision to discontinue the Plaintiff's long-term disability benefits was arbitrary and capricious.  In this regard, the Plaintiff argues that (1) the Defendants arbitrarily relied on isolated findings while ignoring or mischaracterizing the bulk of the medical evidence in the administrative record; (2) the Defendants violated its own policies and procedures when they failed to give significant weight to the award granting the Plaintiff social security disability insurance; and (3) the conflict of interest resulting from First Unum's role in both determining and paying claims for benefits weighs in favor of finding of a wrongful denial of benefits.  For the reasons set forth below, the Court disagrees with the Plaintiff and finds that the Defendants are entitled to summary judgment in their favor, as their determination to deny the Plaintiff benefits was neither arbitrary nor capricious.

### 1.  The Defendants' Determination was Supported by Substantial Evidence

In filing the administrative appeal, the Plaintiff carried the burden to demonstrate that she was disabled within the meaning of the Plan.  See Ianniello v. Hartford Life & Accident Ins. Co., 10-CV-370 (SJF)(ARL), 2012 U.S. Dist. LEXIS 12099, at *9 (E.D.N.Y. Jan. 26, 2012) ("It was plaintiff's burden to demonstrate her disability under the terms of the plan, and it was reasonable for [the plan administrator] to require objective evidence to support her alleged physical limitations.");  Keiser v. First Unum Life Ins. Co., 99 Civ. 12101 (WHP), 2005 U.S. Dist. LEXIS 10987, at *32 (S.D.N.Y. June 8, 2005) ("Plaintiff bears the burden of proving entitlement to a disability benefit.") (citations omitted); Barnable v. First Fortis Life Ins. Co., 44 F. Supp. 2d 196, 204 (E.D.N.Y. 1999) ("The insured has the burden of proving disability as defined by the

policy.") (citation omitted); <u>George v. First Unum Life Ins. Co.</u>, 93 Civ. 2916 (HB), 1996 U.S. Dist. LEXIS 18062, at *4 (S.D.N.Y. Oct. 15, 1996) ("The burden of proving entitlement to coverage for an insurance benefit rests with the claimant. If the insured cannot meet this burden, he is not entitled to benefits.") (citations omitted). The Defendants determined that the Plaintiff failed to meet that burden because she could not demonstrate that her back and hip conditions prevented her from performing the duties of any gainful employment. The Court's review of the administrative record reveals that this determination is supported by substantial evidence.

Initially, the Court recognizes that the Plaintiff's claim did have some support within the administrative record. For example, MRE and CT scans of the Plaintiff's lumbosacral spine revealed that the Plaintiff suffered disc herniation at the L4-5 level, as well as disc bulging, protrusions and tears. Moreover, Dr. Coladner, the Plaintiff's treating physiatrist, found that the Plaintiff had a partial disability and that this disability prevented her from performing sedentary activity. Similarly, Dr. Scutaro, the Plaintiff's treating chiropractor, determined that the Plaintiff's condition would be exacerbated by frequent lifting, carrying, pushing, pulling or sitting. As a result, he felt that the Plaintiff's functional ability was limited to just one to two hours of sedentary activity during the course of an eight hour workday. In addition, the functional vocational assessment completed by vocational assessment expert Pasternak indicated that the Plaintiff was unable to perform the duties of her former position as a Blood Donor Specialist. In addition, the Plaintiff was awarded social security disability insurance benefits after appealing the initial denial of these benefits by the SSA. In connection with this appeal, the Plaintiff's medical records were reviewed by Dr. Fulco, who determined that the Plaintiff was (1) limited to sitting and standing or walking no more than two hours each in an eight-hour work day

and (2) unable to lift/carry more than ten pounds.  Also, the Plaintiff received workers' compensation benefits.

Nevertheless, there was also substantial credible medical evidence which indicated that she was not disabled.  Importantly, "[s]o long as evidence submitted by the plaintiff is not arbitrarily discredited by the administrator, 'courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'"  Daniel v. UnumProvident Corp., CV-04-1073 (SJF), 2010 U.S. Dist. LEXIS 115171, at *58 (E.D.N.Y. Oct. 27, 2010) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)).  Moreover, "the mere existence of conflicting evidence does not render the [an administrator's] decision arbitrary or capricious."  Lekperic v. Bldg. Serv. 32B-J Health Fund, 02 CV 5726 (JG), 2004 U.S. Dist. LEXIS 14020, at *11 (E.D.N.Y. July 23, 2004) (citation omitted). Rather, it suffices that there was plausible medical evidence in the record that a reasonable mind could accept as adequate to support the conclusion reached by the Defendants.

Here, Dr. McPhee, Dr. Krouskop and Dr. Davis all did a thorough review of the medical records and provided detailed reports supporting their conclusions concerning the Plaintiff's claim.  After reviewing the medical records, Dr. McPhee concluded that "[t]he extensive medical information available for review d[id] not support that the [Plaintiff] would not have the functional capacity to perform occupational requirements that would include [(1)] occasionally exerting up to 10 pounds of force to lift, carry, push, pull and otherwise move objects[;] [(2)] frequently exert[ing] negligible amount of force to lift, carry, push, pull and otherwise move objects[;] and [(3)] sit[ting] for six hours per eight hour work day with brief periods of standing

and walking." (AR 1893.)  Dr. McPhee based her conclusion in part on the fact that the

Plaintiff's reported 8/10 or 10/10 pain during medical appointments was contradicted by her

being observed to be in no apparent distress at these same appointments.  She also emphasized

that none of the Plaintiff's treating physicians noted muscle spasms and that the Plaintiff did not

experience any sympathetic changes in heart rate and blood pressure in connection with the May

17, 2007 diskography.

Of importance, by signing Dr. McPhee's April 22, 2008 letter, Dr. Rogaschefsky, the

Plaintiff's treating orthopedist, conveyed his agreement with Dr. McPhee's conclusion that the

Plaintiff's extensive medical record did not support total disability and "that the [Plaintiff] could

sit for a total of six hours per eight hour workday with position change as needed." (AR 1920.)

He also conveyed his agreement with Dr. McPhee's finding that the Plaintiff "could occasionally

exert up to 10 pounds of force to lift, carry, push, pull and otherwise move objects, frequently

exert negligible amount of force to lift, carry, push, pull and otherwise move objects, and

stand/walk for up to a total of two hours per eight hour workday, for brief periods at a time."

(AR 1920.)  Indeed, not only did Dr. Rogaschefsky sign the letter on May 23, 2008, he offered

no comments or statement on the letter indicating that he did not agree with Dr. McPhee's

opinion. (AR 1920.)  Furthermore, in response to Dr. McPhee, Dr. Shalmi, the Plaintiff's

treating pain management specialist, stated that he did not feel he had adequate information to

determine activity restrictions for the Plaintiff.

The Plaintiff argues that the Defendants' acted arbitrarily and capriciously in relying on

Dr. Rogashefsky's May 23, 2008 signature of Dr. McPhee's April 22, 2008 letter.  In doing so,

she cites to <u>Alberigo v. Hartford,</u>10 CV 4735 (NG)(JO), 2012 U.S. Dist. LEXIS 134013

(E.D.N.Y. Sept. 14, 2012), in which the court held that the insurer erred in "simply relying on a

single piece of information that weighed in favor of discontinuing benefits and discounted other information that weighed in favor of granting benefits." Id. at *34. However, in that case, the court emphasized that "[the insurer's] determination relie[d] not on medical evidence, but solely on one statement by [the doctor] that [wa]s inherently contradictory." Id. In contrast, here, there was nothing contradictory about Dr. Rogaschefsky's clear affirmance of Dr. McPhee's opinion, nor did the Defendants rely on just this one piece of information; they also relied on other substantial medical evidence.

In addition, Dr. Krouskop determined that the Plaintiff only required the following restrictions: (1) avoiding all right sideline positioning; (2) avoiding lifting more than ten to 15 pounds lifting restriction; (3) avoiding repetitive bending, twisting or stooping; and (4) avoiding repetitive overhead lifting. Dr. Krouskop also found specific faults in Dr. Coladner's findings, because she neither evaluated the right plantar flexor weakness with electrodiagnostic studies in order to confirm the presence of a radiculopathy, nor checked for any atrophy of the right gastrocnemius, which would have been present in a chronic, impairing S-1 radiculopathy.

Dr. Davis concurred with Dr. Krouskop's findings with respect to the Plaintiff's restrictions and limitations, which he recognized was consistent with the opinions of Dr. Dutta, Dr. Rogachefsky, and the FCE. (AR 2399.) Dr. Davis also provided specific reasons for why he disagreed with Dr. Colander's opinion that the Plaintiff suffered from a "partial disability." He explained that her opinion "[wa]s non-specific regarding function" and "1-2 hours of sedentary ability [wa]s not consistent with abilities noted during FCE, reported [activities of daily living] and known pathology." (AR 2399.)

The administrative record also included an independent FCE conducted on September 5, 2008, which demonstrated that the Plaintiff was capable of (1) frequently sitting and standing;

(2) occasionally exerting up to twenty pounds of force; and (3) frequently exerting up to ten pounds frequently, or one-third to two-thirds of the day. (AR 2173, 2177.) Thus, it established that the Plaintiff was capable of sustaining the light level of work for an eight-hour day for a 40-hour week.

In addition, Parras-Portenzo, a Senior Vocational Rehabilitation Consultant, found that the Plaintiff had skills transferable to alternate occupations, which required occasional exertion and occasional lifting of up to ten pounds and which were performed primarily while sitting. Furthermore, another Senior Vocational Rehabilitation Consultant, Letichevsky, conducted a vocational assessment, in which she considered the Plaintiff's work history, skills, education, training and geographic location. She concluded that the Plaintiff's vocational options included medical receptionist, blood bank credit clerk and patient appointment clerk. Letichevsky explained that these occupations were performed in an office setting and that the Plaintiff would be able to change positions as needed by either using a sit/stand work station or by taking micro-breaks to perform tasks like copying, faxing, getting a beverage and/or using the rest room. Lastly, Byard, a third, Senior Vocational Rehabilitation Consultant, submitted a vocational assessment of the Plaintiff that considered Pasternak's report. He determined that the September 5, 2008 FCE "laid out the underlying rationale supporting the [Plaintiff's] suitability for entry-level positions in the Medical Receptionist, Blood Bank Credit Clerk, and Patient Appointment Clerk occupations" and that Pasternak's evaluation did not change these FCE's results.

The Plaintiff contends that "none [of the job descriptions of these positions on the vocational assessment] include copying and/or faxing, nor do they indicate that they could be performed while using a sit/stand station nor . . . set forth any other information which would support a conclusion that a person working in the position would be able to take micro-breaks to

the degree needed to accommodate [the Plaintiff's] disability." (Pl. Br., pg. 19.) However, the Plaintiff ignores that the job descriptions only listed the primary duties and thus, did not preclude the possibility that these occupations could include additional responsibilities. Moreover, Letichevsky had the adequate expertise to assess what each vocational option entailed and whether it could accommodate the Plaintiff's conditions.

The Court further notes that the Plaintiff's reliance on Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 215 (2d Cir. N.Y. 2006), is misplaced. (Pl. Br., pg. 20.) In Demirovic, the Second Circuit held that "[a]finding that a claimant is physically capable of sedentary work is meaningless without some consideration of whether she is vocationally qualified to obtain such employment, and to earn a reasonably substantial income from it, rising to the dignity of an income or livelihood, though not necessarily as much as she earned before the disability." Id. at 215. In this case, Letichevsky, as well as the other vocational specialists, made exactly this determination; they evaluated the Plaintiff's education, skills, previous work experience, and geographic location and determined those vocational occupations that would be suitable for the Plaintiff given her restrictions and limitations.

Moreover, although the Plaintiff was ultimately awarded social security disability insurance on appeal, the Defendants had access to the records that the SSA relied on in making its initial determination to deny the Plaintiff benefits. For instance, Dr. Dutta conducted an orthopedic evaluation of the Plaintiff and noted that the Plaintiff's activities of daily living included cooking, cleaning, laundry, shopping, showering herself, bathing herself, dressing herself, watching television, listening to the radio and reading. He found that she could (1) walk on her heals and toes without difficulty; (2) squat fully; (3) rise from a chair without difficulty; (4) change for the exam without help; and (5) get on and off the exam table without any

assistance. As a result, Dr. Dutta concluded that while the Plaintiff had mild to moderate limitations with respect to frequent walking and lifting weight, she had no limitation with respect to sitting or standing.

Further, the SSA referred the Plaintiff's claim to the Office of Special Investigations because it had concluded that the Plaintiff's alleged limitations in function conflicted with the available medical evidence. The Office of Special Investigations' surveillance of the Platiniff revealed that the Plaintiff was alert and engaged in her surroundings; did not look noticeably tired; had a normal gait, station and pace; had no difficulty exiting and entering her car or stretching back to reach the items in the rear seat; did not need to stop and rest while walking and was not in any obvious discomfort.

While some of the information that the Defendants relied on in deciding to discontinue the Plaintiff's benefits was derived from record reviews and not from actual examinations, this alone does not make the Defendants' decision arbitrary or capricious, as the Plaintiff seems to suggest. First, the Court notes that the Defendants' decision did rely on information and opinions that were derived from doctors and vocational specialists who had the opportunity to examine the Plaintiff. This included the examination by Dr. Dutta, Dr. Rogaschefsky's acknowledgment of agreement with Dr. McPhee's, the surveillance performed by the Office of Special Investigations, and the September 5, 2008 FCE. In any event, "plan administrators may rely on the opinion of independent medical reviewers despite the fact that such reviewers may not have conducted an examination of the claimant, or may have adopted an opinion that conflicts with those held by the claimant's treating physicians." Alfano, 2009 U.S. Dist. LEXIS 7688 at *46–47. Thus, the Defendants reliance on the opinions of non-examining physicians, such as Dr. McPhee, Dr. Krouskop and Dr. Davis, does not make their determination arbitrary or

capricious.  See Fitzpatrick v. Bayer Corp., No 04 Civ. 5134 (RJS), 2008 U.S. Dist. LEXIS 3532,

at *45–46 (S.D.N.Y. Jan. 17, 2008) ("[A]n administrator's reliance on the opinions of non-

examining physicians over the plaintiff's own treating physicians is not, in and of itself, arbitrary

and capricious."); Wagner v. First Unum Life Ins. Co., 2003 U.S. Dist. LEXIS 14245, at *14

(S.D.N.Y. Aug. 13, 2003) ("[T]he administrator of an ERISA plan is not required to accord

treating physicians' opinions greater weight than non-treating physicians.")  (citing Black, 538

U.S. at 834).

    The Court also disagrees with the Plaintiff's contention that the Defendants did not

properly consider the Plaintiff's conditions.  (Pl. Br., pg. 18.)  To the contrary, the Court finds

that Dr. McPhee, Dr. Krouskop and Dr. Davis carefully considered the Plaintiff's medical

history, including the objective medical evidence and the Plaintiff's subjective complaints,

before rendering their opinions on which the Defendants relied.  In this regard, the physicians

were fully aware of the Plaintiff's conditions, but found that despite these conditions, she was

capable of performing at least a sedentary level of work over the course of a 40-hour work week.

    In addition, the Plaintiff's contention that "Dr. McPhee fail[ed] to provide specific

instances of when [the Plaintiff] was not in distress" is erroneous.  (Pl. Br., pg. 18.)  Dr. McPhee

explained that although the Plaintiff was reporting to be experiencing 8/10 pain while at her

medical appointments, her doctors observed that she was in no apparent distress during these

same visits.  (Pl. Br., pg. 18.)

    The Plaintiff further asserts that the Defendants explanation for not affording weight to

Pasternak's vocational assessment was inadequate.  Again, the Court must disagree.  The

Defendants reasoned that it was not according weight to Pasternak's assessment because it was

contrary to the functional capacity findings made in the course of the Defendants' medical

review of the Plaintiff's claim and with the findings of the FCE. The Defendants' further explained that Pasternak's limited his findings to whether or not the Plaintiff could return to her own occupation as a Blood Donor Specialist, and did not consider whether or not the Plaintiff could return to any gainful occupation, which was required by the Plan's definition of disability.

Accordingly, while the Court acknowledges that the Plaintiff has experienced challenges in connection with her back and right hip since her fall at work on December 21, 2005, there is undeniably an abundance of substantial evidence in the administrative record supporting the Defendants' determination that the Plaintiff was not disabled within the Plan's definition of disability. Despite her conditions, there is substantial evidence in the record that she was not incapable of performing any gainful employment. As such, "based on a careful review of the record and in accordance with the highly deferential standard of review applied to such determinations, the [C]ourt declines to substitute its judgment for that of [the Defendants]." Wagner, 2003 U.S. Dist. LEXIS at *14–15.

### 2. The SSA's Decision

The Plaintiff also contends that the Defendants failed to give adequate consideration to her social security disability insurance award. It is true that the award of such benefits should be considered as "one piece of evidence" in support of a claim. Alfano, 2009 U.S. Dist. LEXIS at *55 (observing that SSA decisions should be considered in part because the SSA "is an objective governmental body that undertakes a thorough review of applicants' eligibility for benefits, and has neither the incentive to disperse benefits liberally, nor a reputation for overindulging applicants.") (citations omitted). However, although a favorable determination by the SSA certainly supports a disability claim, it is not controlling where the administrator's decision to deny benefits is otherwise supported by substantial evidence. Badawy v. First Reliance Standard

Life Ins. Co., 581 F. Supp. 2d 594, 605 (S.D.N.Y. 2008) (finding that the administrator did not abuse its discretion in denying a claim for benefits because, notwithstanding the plaintiff's favorable SSA decision, the administrator's determination was supported by substantial evidence); Nelson v. Unum Life Ins. Co. of Am., 421 F. Supp. 2d 558, 571 (E.D.N.Y. 2006) ("As long as the plan's finding is reasonable and supported by substantial evidence, it is not arbitrary and capricious simply because it differs from that of the SSA.") (citation and internal quotation marks omitted); Gaitan v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus., 99 Civ. 3534 (NRB), 2000 U.S. Dist. LEXIS 3323, at *14 (S.D.N.Y. Mar. 17, 2000) ( "An ERISA plan's determination on a disability claim that differs from that of the Social Security Administration is not arbitrary and capricious so long as the plan's finding is reasonable and supported by substantial evidence."); but see Alfano, 2009 U.S. Dist. LEXIS (finding that the administrator's denial of the participant's claim was arbitrary and capricious where, in addition to favorable finding from the SSA, the claimant's six treating physicians found that he was disabled).

Here, as has been established above, the Defendants' determination was supported by substantial evidence. This substantial evidence included the opinions of Dr. McPhee, Dr. Krouskop, Dr. Davis, Dr. Dutta and Dr. Rogaschefsky, as well as a number of vocational specialists, the September 5, 2008 FCE and the SSA's investigation. This substantial evidence was sufficient to establish that, despite her medical conditions, the Plaintiff was still capable of performing a sedentary occupation.

However, the Plaintiff further asserts that the Defendants acted arbitrary and capricious because they disregarded the Claims Manual, which required the Defendants to "give significant weight to an award of Social Security Disability benefits as supporting a finding of disability,

unless there is compelling evidence that the Social Security Award was . . . inconsistent with applicable medical evidence." (Pl. Br., pg. 20, Schaeffer Decl., Exh. A.) The Court acknowledges that "courts in this Circuit routinely consider the content of an administrator's claims manual because 'it was also available to the defendant when it was evaluating plaintiff's claim.'" Schussheim v. First Unum Life Ins. Co., 09 CV 4858 (DRH)(GRB), 2012 U.S. Dist. LEXIS 97835, at *10–11 (E.D.N.Y. July 13, 2012) (quoting Nelson, 421 F. Supp. 2d at 573). "Indeed, a review of the Claims Manual may prove essential in determining whether defendant acted arbitrarily or capriciously in this instance." Id.

Nevertheless, in this case, a review of the record shows that the Defendants did follow the Claims Manual, in that they considered and then clearly explained why they did not afford significant weight to the favorable decision of the ALJ in the Plaintiff's social security appeal. For example, the Defendants considered the findings of the SSA's Office of Investigations, as its surveillance revealed that the Plaintiff's reported restrictions and limitations did not comport with the observed activities of her daily living. They also considered the evaluation of Dr. Dutta, who provided a consultative examination of the Plaintiff for the SSA. Although it is unclear whether the ALJ considered this evidence when reversing the SSA's initial determination to deny the Plaintiff's benefits, the Court finds that it was not unreasonable on the part of the Defendants to consider this evidence in making their determination.

Even more importantly, the Claims Manual states that "inconsistent medical evidence" includes " an independent medical evaluation [obtained] after the [social security disability insurance] award" that "clearly establishes that the claimant has no current [restrictions and limitations] that would prevent the individual from working." (Schaeffer Decl, Exh. B.) Here, the Defendants, as they reasonably explained, were able to rely on information that was not

available to the SSA at the time of the ALJ's decision. This included the September 5, 2008 FCE, as well as the opinions of several physicians, including the Plaintiff's treating physicians, and vocational specialists. As such, the Court finds that the Defendants did not act arbitrarily and capriciously in deciding not to give significant weight to the Plaintiff's social security determination.

### 3. First Unum's Alleged Conflict of Interest

After Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 116–17, 128 S. Ct. 2343, 2351, 171 L. Ed. 2d 299 (2008), "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion . . . ." McCauley, 551 F.3d at 133 (citing Glenn, 128 S. Ct. at 2348). The weight assigned to the alleged conflict will differ "according to the evidence presented." Id. However, the existence of a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." Id. (quoting Glenn, 128 S. Ct. at 2351). "Evidence that a conflict affected a decision may be categorical (such as 'a history of biased claims administration') or case specific (such as an administrator's deceptive or unreasonable conduct), and may have bearing also on whether a particular decision is arbitrary and capricious." Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 140 (2d Cir. 2010) (quoting Glenn, 128 S. Ct. at 2351-53).

Here, the Court is satisfied that First Unum was not influenced by a conflict of interest. First, First Unum paid the Plaintiff long-term disability benefits for two years, finding that she was disabled under the Plan's definition. Moreover, both in making the initial determination and in making the appeal determination, First Unum conducted a thorough review of the Plaintiff's

medical records and gathered the opinions of several physicians and vocational specialists.  See

Siegel v. Hartford Life Ins. Co., 10-CV-4285 (DRH) (ETB), 2012 U.S. Dist. LEXIS 87806, at

*45 (E.D.N.Y. June 25, 2012) ("[The insured] assigned multiple individuals to make and then

review the initial decision to deny [the claimant's] claim, and assigned separate individuals to

process her appeal, all of which promotes accuracy of the administrator's review process.")

(citation and internal quotation marks omitted).

In addition, First Unum had a Functional Capacity Evaluation performed on the Plaintiff

on September 5, 2008.  They also followed up with all of the Plaintiff's treating physicians in

order to get their opinions on the Plaintiff's condition and to get their comments on the opinions

of the Defendants' experts.   See id. ("[T]he individuals and consultants who reviewed [the

claimant's] claim made numerous attempts to contact [the claimant's] treating physician and

include his input in her file, which indicates that [the insured] made a concerted effort to promote

the accuracy of the claims process.") (citation and internal quotation marks and alterations

omitted).  As such, "any asserted structural conflict of interest on [the First Unum's] part 'proves

less important (perhaps to the vanishing point).'"  Id. (quoting Schnur v. CTC Communs. Corp.

Group Disability Plan, 413 Fed. Appx. 377, 380 (2d Cir. 2011)).   See also Bendik v. Hartford

Life Ins. Co., 03 Civ. 8138 (LAP),2010 U.S. Dist. LEXIS 70978 (S.D.N.Y. July 12, 2010), aff'd

432 Fed. Appx. 24, 2011 U.S. App. LEXIS 19037 (2d Cir. 2011).

In support of her position, the Plaintiff refers to pending lawsuits by other claimants

against First Unum and points to the Second Circuit's decision in McCauley, which noted "First

Unum's well-documented history of deception and abusive tactics [was] additional evidence that

it was influenced by its conflict of interest as both plan administrator and payor in denying

[claimant's] claim for benefits."  551 F.3d at 133.  However, despite the Second Circuit's

previous criticism of First Unum's claim determinations, where, as here, there is substantial evidence supporting First Unum's claim determination, courts have found that "these doubts are not enough to tip the balance of factors in favor of [a claimant]." Donna v. Mem'l Sloan Kettering Cancer Ctr., 08 Civ. 3618 (JGK), 2010 U.S. Dist. LEXIS 21717, at *43 (S.D.N.Y. Mar. 8, 2010), aff'd No. 10-1423-cv, 2012 U.S. App. LEXIS 22925 (2d Cir. Nov. 6, 2012); see also Daniel v. UnumProvident Corp., CV-04-1073 (SJF), 2010 U.S. Dist. LEXIS 115171, at *47–48 (E.D.N.Y. Oct. 27, 2010)  ("Although many courts, including the Second Circuit, have recognized that UnumProvident  and/or its subsidiaries (collectively "Unum"), including UNUM Life, has a history of biased claims administration, . . . the conflict of interest evidenced from that history is offset, in part, by the active steps UNUM Life took to promote accuracy in its claims management process in this case, i.e., repeated requests and/or acceptances of additional information from plaintiff and reviews of plaintiff's file by medical and vocational consultants."); VanWright v. First Unum Life Ins. Co., 740 F. Supp. 2d 397, 405 (S.D.N.Y. 2010) ("Upon review of the record [] the Court finds the instant dispute to be distinguishable from McCauley. The presence of a conflict of interest should be dispositive only as a 'tiebreaker,' and is not relevant when the conflicted party's conduct cannot otherwise be characterized as arbitrary or capricious.   Here, . . . Unum's conduct cannot be characterized as arbitrary or capricious so as to merit decisive consideration of Unum's conflict of interest. The record reveals that Unum took active steps to remove potential bias and to promote the accuracy of its review. To these ends, Unum continued [the claimaint's] benefits for four years as it evaluated his claim, procured an independent FCE at its own expense, sought analysis from two vocational experts, and had four medical professionals review his file on several occasions, including an independent medical review conducted by a board-certified neurosurgeon. As a

result, the Court is not persuaded that Unum's dual role as administrator and payor is dispositive here.")

Accordingly, the Court finds that the existence of a conflict of interest in this case is not a significant factor, as there is substantial medical evidence in the administrative record to establish that the Defendants' determination was neither arbitrary nor capricious.

## C.  As to the Plaintiff's Retirement Income Protection ("RIP") Benefits Claim

In addition to long-term disability benefits, the Plaintiff also contends that the Defendants have failed to pay her the required RIP benefits.  (Pl. Br., pg. 23.)   The Defendants argue that the Plaintiff has failed to exhaust administrative remedies on this claim.  (Def. Opp., pg. 18, Def. Reply, pg. 7.)  However, the Plaintiff counters that in entering into the stipulation and waiving their First Defense, the Defendants agreed to litigate the Plaintiff's RIP claim, notwithstanding the Defendants' failure to exhaust administrative remedies defense.  (Pl. Reply, pg. 7–8.)

The First Defense of the Defendants' Answer states that the "Plaintiff has *failed to state a claim upon which relief can be granted*, to the extent plaintiff asserts a claim seeking to recover any relief other than: (a) monthly benefits allegedly due under the Policy, as to which an administrative determination has previously been made, and as to which plaintiff has exhausted her administrative remedies[.]"  (Answer, First Defense, emphasis added.)  Thus, in entering into the stipulation, the Defendants waived a failure to state a claim defense, not a failure to exhaust administrative remedies defense.  Indeed, irrespective of the use of language concerning the exhaustion of administrative remedies, this failure to state a claim defense is distinguishable from the failure to exhaust administrative remedies defense raised by the Defendants during the summary judgment phase of this litigation.

"[I]n Nichols v. Prudential Insurance Co. of America, 406 F.3d 98 (2d Cir. 2005), [the Second Circuit" stated that it was 'unclear' whether a motion to dismiss for failure to exhaust administrative remedies under ERISA section 502(a)(1)(B) 'is properly brought for failure to state a claim, lack of subject matter jurisdiction, or on some other procedural basis.'"  Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 444 (2d Cir. N.Y. 2006) (quoting Nichols, 406 F.3d at 105.)  In Paese v. Hartford Life & Accident Ins. Co., the Second Circuit explained:

> [W]e have described the "primary" purposes of the exhaustion requirement under ERISA as follows:
>
> to uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; [to] provide a sufficiently clear record of administrative action if litigation should ensue; . . . to assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo; . . . to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned.

Id. at 445.  The Second Circuit went on to recognize that "[t]hese important policy goals have little or no bearing on the existence of a claim, or on ripeness, and therefore have little to do with the presence of an Article III case or controversy."  Id.  Rather, "the requirement is purely a judge-made concept that developed in the absence of statutory language demonstrating that Congress intended to make ERISA administrative exhaustion a jurisdictional requirement."  Id. Accordingly, the Second Circuit held that "a failure to exhaust ERISA administrative remedies is not jurisdictional, but is an affirmative defense."  Id. at 446.  As such, a plaintiff is not required to plead exhaustion of administrative remedies.  White v. Univ. of Rochester, 12-CV-6288 CJS, 2012 U.S. Dist. LEXIS 117250, at *8 (W.D.N.Y. Aug. 20, 2012) ("Moreover, a plaintiff is not required to plead the absence of an affirmative defense. Accordingly, Defendant's contention that Plaintiff was required to plead exhaustion of administrative remedies in connection with a

claim under Section 502(a)(1)(B) is incorrect.") (quoting <u>Black v. Coughlin</u>, 76 F.3d 72, 75 (2d Cir. 1996)).

While the Defendants' Answer does not assert failure to exhaust administrative remedies as an affirmative defense, "in this Circuit, it is well established that an affirmative defense may be asserted even at summary judgment where the party opposing the affirmative defense has the opportunity to respond effectively to that defense, and has otherwise suffered no prejudice as a result of its late pleading." <u>Melie v. EVCI/TCI College Admin.</u>, 08 Civ. 5226 (HB), 2009 U.S. Dist. LEXIS 42849, at *39–40 (S.D.N.Y. May 20, 2009) (citing <u>Feeney v. Dunham</u>, No. 06cv310 (DJS), 2007 U.S. Dist. LEXIS 28808, at *9–10 (D. Conn. Apr. 18, 2007) (in turn citing <u>Astor Holdings Inc. v. Roski</u>, 325 F. Supp. 2d 251, 260-61 (S.D.N.Y. 2003)). Here, the Court finds that the Defendants have properly asserted failure to exhaust administrative remedies as an affirmative defense. In this regard, the Defendants asserted this affirmative defense in their opposition to the Plaintiff's motion for summary judgment, thereby giving the Plaintiff the opportunity to respond to the defense in her reply.

A review of the records shows that the Plaintiff failed to exhaust administrative remedies with respect to her RIP benefits claim, as she never raised this issue in her appeal or at any other time during which the Defendants were considering her claim for long-term disability benefits. "Subject to equitable considerations such as waiver, estoppel, and futility, failure to pursue reasonable claim procedures is grounds to . . . enter summary judgment on an ERISA claim." <u>Marmol v. Div. 1181 A.T.U. - N.Y. Emples. Pension Fund & Plan</u>, 12-CV-1861, 2012 U.S. Dist. LEXIS 110751, at *14 (E.D.N.Y. Aug. 7, 2012); <u>see</u> <u>also</u> <u>Morillo v. 1199 Seiu Benefit</u>, 783 F. Supp. 2d 487, 493 (S.D.N.Y. 2011) ("Where a plan participant or beneficiary has not exhausted her administrative remedies, a plan defendant is entitled to dismissal or summary judgment.").

The Plaintiff raises no such considerations in this case. Therefore, since the Plaintiff failed to exhaust administrative remedies, the Court grants summary judgment in favor of the Defendants on the Plaintiff's RIP benefits claim.

**D. As to the Plaintiff's Claims for Attorneys' Fees**

The Plaintiff has made a claim for attorneys' fees. Pursuant to 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party" in any ERISA action. In <u>Hardt v. Reliance Standard Life Insurance Co.</u>, 130 S. Ct. 2149, 176 L. Ed. 2d 998 (2010), the Supreme Court "held that the proper standard for determining whether a fee claimant is eligible for § 1132(g)(1) fees is whether the claimant has achieved 'some degree of success on the merits,' not whether the claimant was a 'prevailing party.'" <u>Toussaint v. JJ Weiser, Inc.</u>, 648 F.3d 108, 110 (2d Cir. 2011) (quoting Hardt, 130 S. Ct. at 2158). As the Court has granted summary judgment in favor of the Defendants on all of the Plaintiff's claims, the Plaintiff has failed to achieve any degree of success on the merits. Therefore, the Plaintiff is not entitled to attorneys' fees. <u>See</u> <u>Katzenberg v. Lazzari</u>, 406 Fed. Appx. 559, 563 (2d Cir. 2011) (finding that the district court's decision not to award attorney's fees was not an abuse of discretion because the Plaintiff achieved no success on the merits); <u>Weber v. AVX Pension Plan for Bargaining Unit Emples.</u>, 397 Fed. Appx. 721, 722 (2d Cir. 2010) ("Accordingly, [the Plaintiff], having achieved no success on the merits, cannot be awarded attorney's fees.")

**E. As to the Defendants' *In Limine* Motion**

In light of the Court's ruling, the Defendants' *in limine* motion seeking an order precluding introduction at trial of any evidence other than the contents of the administrative record is rendered moot.

### III. CONCLUSION

Based on the foregoing, the Plaintiff's motion for summary judgment is denied and the

Defendants' motion for summary judgment dismissing the Complaint is granted.  The Clerk of

Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      February 21, 2013

                                 _____*/s/ Arthur D. Spatt*_____
                                   ARTHUR D. SPATT
                          United States District Judge